## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, PEORIA DIVISION

| | | |
|---|---|---|
| OSF Healthcare System, an<br>Illinois not for profit corporation d/b/a<br>Saint Francis Medical Center, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 08-CV-1328 |
| v. | ) | |
| | ) | |
| Concert Health Plan Insurance Co.,<br>Ronald Miller, and<br>Robin Miller, | ) | |
| | ) | |
| Defendants. | ) | |

## BEFORE U.S. MAGISTRATE JUDGE BYRON G. CUDMORE

## <u>OPINION</u>

St. Francis Medical Center ("St. Francis") pursues an ERISA claim against Concert Health Plan Insurance Company ("Concert") for denying the bulk of Ronald Miller's benefits claim arising from his hospitalization and surgery at St. Francis in August 2007.[1]  Concert processed the claim at the out-of-network rate and St. Francis contends that the claim should have been processed at in-network rates.

---

[1]The Millers have assigned their rights against Concert to Plaintiff.  (Complaint, para. 12).  Plaintiff is also suing the Millers for amounts due for co-insurance, or, if its claim against Concert fails, for the entire amount due.  (Complaint, Counts II-VI).

Before the Court are opposing motions for summary judgment by Concert and St. Francis, as well as various motions to strike, a motion to file an affidavit, and a motion to take additional depositions.

After carefully reviewing the parties' submissions on summary judgment, the Court concludes that Concert's denial of benefits was arbitrary and capricious because Concert did not adequately explain the basis for its decision. The case will be remanded to Concert for further proceedings consistent with this opinion.

## Background

Robin Miller enrolled in health insurance coverage for herself and her husband through her employer, Warren Achievement Center, Inc. ("Warren Achievement"). The insurance was provided by Concert through a contract with Warren Achievement. In the form application for benefits completed by Warren Achievement, the purchaser of the policy (in this case, Warren Achievement) is listed as the plan administrator and Concert is listed as the claims administrator and ERISA fiduciary. (d/e 57, Ex. A1, p. 4). The application states that Concert has "full and exclusive discretionary authority" to interpret the policy and make benefit determinations.[2] Id.

_____

[2]Concert does not dispute that it is the proper defendant in this case.

Like many health benefit plans, the amounts covered in Concert's policy depend in large part on whether the medical provider is "in-network" or "out-of-network." Generally, Concert's policy imposes higher deductibles, copayments, and a cap on out-of-network charges. The cap is called the "Maximum Allowable Amount," which appears to be based on Medicare rates. (d/e 80, p. 19).

On Sunday, August 12, 2007, Mrs. Miller's husband, Ronald Miller, suffered a stroke or brain aneurism while at home. His wife drove him to the emergency room at OSF Holy Family Medical Center in Monmouth, Illinois ("Holy Family"), an in-network provider under Concert's policy. Because Holy Family was not equipped to treat Mr. Miller, he was stabilized and airlifted to Peoria, Illinois, for diagnosis and treatment. According to the Millers, attempts were made to contact Concert before the transfer, but no representatives were available because it was Sunday. Concert has no record of such attempts, but agrees that it had no representative available on the weekends. Concert, however, did maintain a website listing its preferred providers.

Mr. Miller was airlifted from Holy Family to St. Francis in Peoria ("St. Francis"), an out-of-network hospital. Methodist Medical Center in

Peoria ("Methodist"), is an in-network hospital and is a few miles from St. Francis.

Mr. Miller had surgery at St. Francis the next afternoon, on Monday, August 13, 2007, apparently performed by Dr. Jeffrey Klopfenstein, a neurosurgeon.   At some point during that day, someone from St. Francis contacted Concert to precertify Mr. Miller's stay.  It is not clear if this contact was made before or after the surgery.  Concert maintains that it was not notified until after the surgery.  Concert further maintains that it informed St. Francis sometime on August 13, 2007, that St. Francis was out-of-network and that Methodist was in-network, but St. Francis contends that it was not notified of this fact by Concert until August 14, 2007.  It is not clear if anyone communicated to the Millers that St. Francis was out-of-network or that Methodist was in-network.  Mr. Miller was released from St. Francis on August 27, 2007.

According to Mr. Johny Antony, Vice President of Operations at Concert, he was notified by Concert employees on August 13, 2007, that Mr. Miller had been admitted to an out-of-network hospital and that the hospital was seeking precertification.  Mr. Antony instructed the employees to precertify if the criteria were met.  Precertification, however, does not

determine whether reimbursement is at in-network or out-of-network rates. That day or the next, he phoned the Chief Financial Officer at St. Francis, leaving a message to see if a rate could be negotiated, but the CFO did not return the call. Antony also testified that he phoned someone at Methodist Hospital on August 14 or 15, 2007, conveyed the precertification information that had been received from St. Francis, and was told that Methodist "would be able to take that patient for the condition." (Antony Dep. p. 100, d/e 57, Ex. D). Antony did not discuss with the Methodist representative the specific treatment Mr. Miller needed and was not sure if he knew at that point that the surgery had already been done. (Antony Dep. p. 108, d/e 57, Ex. D). Thereafter, on August 14 or 15, 2007, a St. Francis representative ("Dawn") called Mr. Antony to negotiate a rate, but those negotiations were unsuccessful. According to Antony, he then asked Dawn to inform the Millers that the charges would be processed at the out-of-network rate and that the Millers could seek in-network care from Methodist. (Antony Aff. pp. 13-17, 83, 104 d/e 57, Ex. D). It is not clear if this information was conveyed to the Millers. Concert granted precertification for Mr. Miller's stay, and in a fax noted that "this inpatient admission/stay is considered as Out-of-Network." (d/e 61-4). It is

undisputed that Mr. Miller could not have been transferred immediately after the surgery to Methodist, but Concert maintains that he could have been transferred once stabilized.

St. Francis' bill totaled over $140,000. Concert processed that bill applying the out-of-network rates and caps and sent an explanation of benefits to the Millers and St. Francis. (Complaint, d/e 1-1, p. 36). The explanation concluded that bulk of the bill was not covered because it was "over maximum allowable," (d/e 1-1, p. 26), which is the policy's cap on out-of-network services. Apparently no other written explanation was given for the denial. *See* 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1(g)(setting forth details and information required to be included in notification of benefits determination).

According to an attachment to the Complaint, Mrs. Miller appealed the explanation of benefits in December, 2007. (Complaint, d/e 1-1, pp. 17, 31-32). In February, 2008, St. Francis joined in the appeal based on the Millers' assignment of rights to St. Francis. (Complaint, d/e 1-1, pp. 29). There is no indication of what opportunities the Millers or St. Francis had to submit information in their appeal of the explanation of benefits.

In a letter dated March 18, 2008, Concert's "Medical Appeal Committee" affirmed that Mr. Miller's medical bills from St. Francis were subject to the out-of-network rates and caps, stating:

> The above listed claims have been received and reviewed by the Medical Appeal Committee. The Medical Appeal Committee has determined that no additional benefits are payable due to the reasons listed below:
>
> A medical provider that is not in the member's insurance network provided services. Please be advised that we do understand that circumstances do arise which prevent using and or seeking in-network providers, but we must apply the benefits according to the policy. Per the policy, all out-of-network covered services are payable on a maximum allowable fee basis. In Mr. Miller's case, we applied the maximum allowable fee basis. Benefits are payable only if services are considered to be a covered expense and medically necessary. All covered services are payable on a maximum allowable fee basis for out of network providers and according to contract rates for participating providers, and are subject to specific conditions, durational limitations and all applicable maximums of the policy. Also, the charges for an air ambulance totaling $13,940.00 were denied as not a covered health benefit since there is a policy exclusion within this member's Certificate of Coverage.

(d/e 57, Ex. G). St. Francis filed this lawsuit in November 2008, seeking the balance owed. The air ambulance charges are not an issue in this case.

Section 1 of the Certificate of Insurance states in relevant part:

> If a PREFERRED provider finds it medically necessary to refer You to a Non-Participating provider, benefits will be paid at the level applicable to the referring provider, but ONLY if there is no PREFERRED provider reasonably available to provide that Service. If there is no PREFERRED provider within 50 miles, We may, at Our discretion, require You to travel to a PREFERRED provider of Our choice. If We do, We will pay the reasonable travel expenses of the Covered Person who is receiving treatment from the PREFERRED provider.

(d/e 80-1, p. 9). St. Francis contends that in-network rates apply because a preferred provider (Holy Family) referred Mr. Miller to St. Francis and that no in-network provider was "reasonably available." Concert disputes this, arguing that preferred providers were reasonably available.

## Analysis

### I. Motions to Strike

Before the Court are motions to strike the affidavits of the followings persons: 1) Dr. Jeffrey Klopfenstein, a neurosurgeon who provided care to Mr. Miller at St. Francis; 2) Johny Antony, the Vice President of Operations at Concert; and 3) Jennifer Ulrich, the Director of Financial Analysis at St. Francis. Also before the Court is Concert's motion to strike the "Steve Todd Analysis" and Concert's motion for leave to submit Deborah Simon's affidavit.

Affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4). "'Personal knowledge' includes inferences—all knowledge is inferential— and therefore opinions. . . . .  But the inferences and opinions must be grounded in observation or other first-hand experience."  Visser v. Packer Eng. Assoc., Inc., 924 F.2d 655, 659 (7th Cir. 1991)(citation omitted). Conclusory assertions lacking factual support are insufficient.  *See* Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir.2001).   Additionally, an affidavit cannot be used to contradict earlier deposition statements by the same declarant, absent a sufficient explanation for the contradiction. Patton v. MFS/Sun Life Financial Distributors, Inc., 480 F.3d 478, 488-89 (7th Cir. 2007);  Bank of Illinois v. Allied Signal Safety Restraint, 75 F.3d 1162, 1168 (7th Cir. 1996).

## A.    Affidavit of Dr. Jeffrey Klopfenstein and the "Steve Todd Analysis"

Concert argues that the arbitrary and capricious standard of review applies and this information cannot be considered because it was not a part of the administrative record.  Concert does not  identify exactly what is part of the  "administrative record," but it clear that this information was not.

Dr. Klopfenstein is the neurosurgeon who provided care for Mr. Miller at St. Francis. He has privileges at both St. Francis and Methodist. St. Francis offers Dr. Klopfenstein's affidavit to show that Methodist could not have provided treatment to Plaintiff. Specifically, Dr. Klopfenstein avers:

> 2. That I am familiar with the services that are currently provided by both Methodist Medical Center and St. Francis Medical, . . .
>
> 3. That I participated in the care and treatment of Ronald Miller at St. Francis Medical Center in August of 2007;
>
> 4. That the services provided to Ronald Miller by St. Francis Medical Center during August of 2007 could not have been provided by Methodist Medical Center and that, if Ronald Miller was transferred from Holy Family to Methodist in August of 2007, he would have been required to be transferred from Methodist to St. Francis upon arrival at Methodist;
>
> 5. That a critical issue regarding Mr. Miller's injury was that Mr. Miller's movement be limited as much as possible and that the additional movement and [sic] of Mr. Miller and the additional time required in a transfer of Mr. Miller to a facility that was farther away, such as Chicago or the suburbs of Chicago, from Holy Family in Monmouth, Illinois, would have put Mr. Miller in substantial risk of additional injury or death.

(Klopfenstein Aff., d/e 61-6).

Dr. Klopfenstein's conclusions in paragraph four are critical to whether services at Methodist were reasonably available under the policy, yet they remain conclusions. Dr. Klopfenstein does not explain how he

arrived at these conclusions. For example, since he apparently has privileges at both hospitals, why could he not provide the same care at Methodist? Exactly what was Mr. Miller's diagnosis and exactly what treatment was required? Are there special facilities and equipment at St. Francis that Methodist lacks? What were the exigencies, if Mr. Miller was stabilized at Holy Family and did not receive surgery until sometime in the afternoon on August 13th? St. Francis has had ample time to obtain a detailed affidavit from Dr. Klopfenstein that might answer these questions and has been on notice for many months that Concert would assail this affidavit on summary judgment. This affidavit is simply too conclusory to be considered as evidence at the summary judgment stage.

The "Steve Todd Analysis" purports to be a document created by a former Director of Financial Analysis at St. Francis. It is a listing of providers for "DRG 528," the diagnostic related grouping that Mr. Miller's services fell under, titled "Intracranial Vasculoar Proc W PDX HEMORRHAGE." (d/e 61-4, p. 7). It is offered to show that Methodist could not have provided treatment to Mr. Miller. It purports to list St. Francis as having 50 DRG 528s from 10/1/2006 to 9/30/2007. A note at

the bottom states that Methodist had zero DRG 528 cases from 1/1/2006 to 12/31/2007.

As Concert points out, the "Steve Todd Analysis" is without foundation. There is no affidavit from Steve Todd stating that he compiled this list, how the list was compiled, its significance to Mr. Miller's treatment, or how Mr. Todd might be able to testify to this issue. There is no explanation of why the DRG is the determinative factor on whether services at Methodist were reasonably available. In sum, in its current form it is not competent, admissible evidence. Accordingly, it will be stricken as well.

### B. Affidavit of Johny Antony

Johny Antony is the Vice President of Operations at Concert and was on the appeal committee that denied the claim. Concert offers his affidavit to show that in-network hospitals were reasonably available. Mr. Antony avers that:

> 12. I was aware of at least three (3) other in network providers that could have accepted Mr. Miller for his care and provided the same care to him in August, 2007, one of which was Methodist Hospital, which is located within one (1) mile of OSF St. Francis.

Mr. Antony has no medical training and he sets forth no basis for his conclusion that Methodist could have provided the same care. He does not

identify Mr. Miller's condition or the services rendered, the steps he took to investigate whether Methodist could provide those services, or the information upon which he relied to draw this conclusion. He does not specify the documents he reviewed and only the employer application is attached to his affidavit. The statements in his affidavit are thus without foundation and the affidavit will be stricken.

### C. Affidavits of Deborah Simon and Jennifer Ulrich

St. Francis attempts to remedy the problem with the "Steve Todd Analysis" by providing the affidavit of his successor, Jennifer Ulrich. However, St. Francis does not dispute Concert's contention that Ulrich was never listed as a potential witness, and St. Francis does not explain why she was not disclosed until now. Considering the affidavit would be unfair to Concert without reopening discovery, which the Court will not do. The parties have had more than ample time for discovery and disclosure.[3] The

---

[3]On May 1, 2009, the Court set a discovery deadline of May 15, 2010. (d/e 13). That deadline was consequently extended twice upon agreed motion to December 15, 2010. (d/e 52). The deadline for deposing the Millers, Dr. Klopfenstein, and certain St. Francis employees was extended to March 31, 2011. (d/e 52). Thus the parties have had over 1 ½ years of fact discovery, plus an additional three months for certain depositions. Concert later moved for more discovery time in the event the Court concluded that it could consider evidence outside of the administrative record (d/e 53), but that motion was denied by the Court because Concert had already filed its summary judgment motion (2/23/11 text order). The Court did note that it may revisit the request if Concert's motion for summary judgment was denied. Because the Court is remanding this case to Concert, however, there is no point in reopening discovery now.

affidavit will therefore be stricken on the ground that Ulrich was not disclosed as a witness.  Fed. R. Civ. P. 37(c)(1)("If a party fails to . . . identify a witness as required by Rule 26(a) or (3), the party is not allowed to use that . . . witness to supply evidence on a motion, . . . .").

For the same reason, the Court will deny Concert's motion for leave to file the affidavit of Deborah Simon, the Chief Operating Officer of Methodist, who avers that Methodist performs surgical procedures to treat brain aneurisms, but falls short of concluding that Methodist could have provided the services Mr. Miller received.  Concert does not dispute that it failed to disclose Ms. Simon as a possible witness during the discovery process.  The summary judgment stage is not the time to spring new witnesses on the opposing party, and summary judgment is not a vehicle to reopen discovery.  In any event, Ms. Simon's affidavit is not detailed enough to consider as evidence that Mr. Miller could have received the same services at Methodist that he did at St. Francis.  The motion will therefore be denied.

## II.  St. Francis' Motion to Take Depositions

St.  Francis asks to depose Dr. Klopfenstein, Ulrich and/or Harbaugh and Simon.  The parties have had ample time for discovery and discovery

has closed.  In any event, as discussed below, the Court concludes that this case must be remanded to Concert for a meaningful consideration of the claim and an adequate explanation of the grounds for its decision. Additional depositions would not cure this problem.

## III.  Motions for Summary Judgment

Concert does not dispute that the services provided by St. Francis were medically necessary.  Where the parties diverge is whether St. Francis' charges should be paid at the in-network rate or the out-of-network rate pursuant to the policy.  St. Francis maintains that Methodist could not have performed the services and that Mr. Miller could not have been safely transferred.  Concert disputes this, maintaining that Methodist or other in-network hospitals such as Northwestern, Central DuPage, and Loyola could have rendered the services.

### A.  Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists when "the evidence is such that a reasonable [factfinder] could return a verdict for the non-moving party."  <u>Anderson v.</u>

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Evidence is viewed in the light most favorable to the non-movant, with material factual disputes resolved in the non-movant's favor.  Id. at 255, *citing* Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).

## B.  ERISA Standard of Review

The parties do not dispute that ERISA applies to this action.

In the context of a denial of benefits under ERISA, the proper standard of review turns on two factors: (1) whether the plan gives the plan administrator discretion to construe policy terms, and (2) the basis for the decision to deny coverage. Where the plan gives the plan administrator discretion to construe policy terms, and the decision to deny coverage is based on an interpretation of the plan, we apply an arbitrary and capricious standard of review. . . .Where either the plan grants no such discretion, or the denial of benefits determination is based on an interpretation of law, we apply a de novo standard of review.

Sellers v. Zurich American Ins. Co., 627 F.3d 627, 631 (7th Cir. 2010).

If deferential review applies, the "arbitrary and capricious" standard governs and discovery is generally limited to the record before the decision maker.  Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan, 195 F.3d 975, 981-82 (7th Cir. 1999).   Under this standard, the

administrator's decision is upheld unless "there is an absence of reasoning to support it."  Jackman Financial Corp. v. Humana Ins. Co., — F.3d —, 2011 WL 2119757 * 3 (7th Cir. 2011).  "'[A]n administrator's interpretation is given great deference and will not be disturbed it if is based on a reasonable interpretation of the plan's language.'" Weitzenkamp v. Unum Life Ins. Co. of America, — F.3d —, 2011 WL 4375637 * 4 (7th Cir. 2011)(quoted cite omitted).   However, the arbitrary and capricious standard is not a "rubber stamp."  Holmstrom v. Metropolitan Life Ins. Co., 615 F.3d 758, 766 (7th Cir. 2010).  A decision will not be upheld if "'there is an absence of reasoning in the record to support it.'" Id. (quoted cite omitted).  "ERISA also requires that 'specific reasons for denial be communicated to the claimant and that the claimant be afforded an opportunity for full and fair review by the administrator.'" Tate v. Long Term Disability Plan for Salaried Employees of Champion International Corp. No. 506, 545 F.3d 555, 559 (7th Cir. 2008), *abrogated on other grounds by* Hardt v. Reliance Standard Life Ins. Co., 130 S.Ct. 2149 (2010).  And, an administrator who holds such broad discretion to determine benefits along with the obligation to pay those benefits has an inherent financial conflict of interest that should be considered.  Metropolitan Life Ins. Co. v. Glenn,

554 U.S. 105 (2008)(courts must consider "structural conflicts of interests" when reviewing for abuse of discretion); <u>Weitzenkamp</u>, 2011 WL 4375637 * 4.

In contrast, if the plan does not confer this broad discretion, a court's review is de novo, meaning an "informed, independent review" that may include consideration of evidence outside the administrative record. <u>Patton v. MFS/Sun Life Financial Distributors, Inc.</u>, 480 F.3d 478, 490 (7th Cir. 2007); <u>Krolnik v. Prudential Ins. Co. of America</u>, 570 F.3d 841, 843 (7th Cir. 2009)(de novo review means independent decision based on evidence presented to court—"it would be best . . . to stop thinking about 'de novo review'—with the implication that the judge is 'reviewing' someone else's action—and start thinking about independent decision . . . ." ). "Absent clear language to the contrary, plans are read to provide for searching judicial review of benefits determinations: plenary review of the administrator's interpretation of the facts and plan, . . . , fortified by the district court's discretionary authority to hear evidence that was not presented in the administrative process, . . . ." <u>Patton</u>, 480 F.3d at 485 (citations omitted). If de novo review applies, summary judgment for

Concert is appropriate only if no rational factfinder could find in St. Francis' favor.  Id. at 485-86.

No "magic words" are required to convey discretionary authority and thus deferential review, but the words must be sufficiently clear to "give the employee adequate notice that the plan administrator is to make a judgment largely insulated from judicial review by reason of being discretionary."  Herzberger v. Standard Ins. Co., 205 F.3d 327, 333 (7th Cir. 2000); Fritcher v. Health Care Service Corp., 301 F.3d 811, 816 (7th Cir. 2002)(without clear notice, employee cannot make informed decision regarding whether to supplement with other insurance).  "If a plan 'is going to reserve a broad, unchanneled discretion to deny claims, [plan participants] should be told this, and told clearly.'"  Diaz v. Prudential Ins. Co. of America, 424 F.3d 635, 637 (7th Cir. 2005), *quoting* Herzberger, 204 F.3d at 333 (brackets added in Diaz).

## C.    Discussion

Concert points to Warren Achievement's application for insurance submitted to Concert in December, 2005.  Under a heading titled "The Following Applies to All Products," the application states in relevant part:

> With respect to paying claims for benefits or determining
> eligibility for coverage under this Policy or Group Plan, WE as

administrator for claims determinations and as ERISA claims review fiduciary as described in 29 C.F.R. 2560.503-1(g)(2), shall have full and exclusive discretionary authority to: 1) interpret Policy or Group Plan provisions, 2) make decisions regarding eligibility for coverage and benefits, and 3) resolve factual questions relating to coverage and benefits.

(d/e 57, Ex. A-1, p. 4).

There is no dispute that this language gives Concert a broad discretionary power to decide benefits. The question is whether this language, found only in the application for insurance, gives sufficient notice of that discretion to *plan participants* to be effective. *See* Ruttenberg v. U.S. Life Ins. Co., 413 F.3d 652, 659 (7th Cir. 2005)("An *employee* must be told in clear terms that the administrator reserves the authority to construe terms in the plan.")(emphasis added). St. Francis contends that the application is not part of the plan.

The Seventh Circuit addressed this issue in Ruttenberg v. U.S. Life Ins. Co., 413 F.3d 652, 659 (7th Cir. 2005), though the parties' briefs do not mention the case. The employer application for insurance in Ruttenberg contained discretionary language, but that discretionary language was not replicated in the certificate of insurance or the summary plan description. The Seventh Circuit affirmed that de novo review applied:

> Both the SPD and the plan's terms are silent as to U.S. Life's interpretive authority. U.S. Life points only to language contained in the Master Application, but the Master Application is, by its terms, an application for group insurance coverage submitted by SMW, not the policy itself. Neither the SPD, the certificate of insurance,nor any subsequent insurance document reproduces the discretion provision and no document notifies an insured that U.S. Life retains interpretive discretion. Given the lack of discretionary language in any document except for the Master Application, we cannot say that boilerplate language in a contract application-representing the negotiations leading to contract formation rather than the substance of the contract-qualifies as the type of notice required by *Herzberger*.

413 F.3d at 659-60.

Like <u>Ruttenberg</u>, the discretionary language here was contained only in the boilerplate of Warren Achievement's application and not reproduced in any other documents. The Master Group Policy and the Certificate of Insurance are silent on Concert's discretion. Concert contends that the statement in the Certificate of Insurance that "[d]ecisions by Us on payment of claims is based only on whether benefits are available under the policy" grants broad discretion. (d/e 80-1, p. 39). However, this obvious statement applies to every benefits decision, regardless of the standard of review. <u>Herzberger</u>, 205 F.3d at 331 (statement that benefits will be paid if the administrator determines benefits are due does not confer discretion).

However, there may be a difference between <u>Ruttenberg</u> and this case. Here, an integration clause in the Master Group Policy incorporates the application as part of the policy. The integration clause in the Master Group Policy provides that: "The provisions of this policy, the attached policy holder and *Employer* applications, the attached Certificate of Insurance, any attached riders or information sheets and the schedule of premiums constitute the entire contract between the policyholder, the *Employer* and *Us*." (d/e 57, Ex. B, p. 2 and Section IV(A))(emphasis in original). The Certificate of Insurance in turn incorporates the Group Policy by reference. (Complaint, Ex. B, p. 1)("The insurance described by this certificate is subject to all the provisions, terms, exclusions and conditions of the Group Policy. The Group Policy is available at the offices of your group."). The group policy in <u>Ruttenberg</u> apparently was not made a part of the district court record in that case. <u>Ruttenberg v. U.S. Life Ins. Co.</u>, 01-cv-8200 (N.D. Ill., 2/18/04 court order, d/e 62, p. 17). This Court therefore does not know if the <u>Ruttenberg</u> policy contained a similar integration clause.

One district court in this Circuit has concluded that this language does confer discretion, even though it is found only in the employer's

application, because the application was incorporated into the contract. Killian v. Concert Health Plan Ins. Co., 2010 WL 2681107 * 6 (N.D. Ill. 2010)(not reported). The parties do not mention this case either, even though Mr. Farahvar was counsel for Concert in Killian. The court in Killian relied in part on the Seventh Circuit's decision in Shyman v. Unum Life Ins. Co., 427 F.3d 452, 455 (7th Cir. 2005), which held that discretionary language in a certificate of insurance was enough to confer discretion, even though that language was not repeated in the "body of the policy." The Seventh Circuit in Shyman reasoned that "this package of documents declares that the certificate of insurance is *part* of the policy, unless it contradicts some other clause . . . if the discretion-granting language can be on any page of a multi-page plan (and it can), the fact that this page bears its own caption is irrelevant." 427 F.3d at 455 (emphasis in original).

Shyman, however, went on to say that the clause communicated the discretion *to the participant*s. 427 F.3d at 455. Here, the discretion-granting language was only a part of the employer application under a "This Applies to All Products" heading. Even if incorporated by an

integration clause, the Court wonders how the placement of such language effectively communicates same to the employees or other plan participants.

To complicate the analysis even further, St. Francis argues in its reply that 50 Ill.Admin.Code § 2001.3 prohibits Concert from retaining discretionary power. That section took effect in July 2005 and states:

> No policy, contract, certificate, endorsement, rider application or agreement offered or issued in this State, by a health carrier, to provide, deliver, arrange for, pay for or reimburse any of the costs of health care services or of a disability may contain a provision purporting to reserve discretion to the health carrier to interpret the terms of the contract, or to provide standards of interpretation or review that are inconsistent with the laws of this State.

Concert does not squarely address this issue or the questions of preemption it raises. *See* Ball v. Standard Ins. Co., 2011 WL 759952 *7 (N.D. Ill. 2011)(ERISA does not preempt § 2001.3 because section regulates insurance; § 2001.3 applies to benefit determinations as well as contract interpretations)(not reported); Ball v. Standard Ins. Co., 2011 WL 2708366 (N.D. Ill. 2011)(reviewing disability benefits decision de novo because § 2001.3 prohibited discretionary clause)(not reported); Garvey v. Piper Rudnick LLP Long Term Disability Ins. Plan, 2011 WL 1103834 *2 (N.D. Ill. 2011)("The express purpose of Section 2001.3 in prohibiting discretionary clauses was to ensure that courts would apply *de novo* review

in ERISA cases where the denial of benefits is challenged.").  To be fair, St. Francis did not raise the issue until its reply, and Concert is correct that "arguments raised for the first time in the reply brief are waived."  Mendez v. Perla Dental, 646 F.3d 420, 424 (7th Cir. 2011).

The Court sets forth the above law to illustrate that the determination of the standard of review is not an easy one and deserves in-depth briefing by the parties.  However, the Court will not order additional briefing because the determination is not yet necessary.  Concert's written denial of benefits does not survive even arbitrary and capricious review because it is not supported by adequate reasoning.

"ERISA requires plan administrators to communicate specific reasons for a denial of benefits to the claimant and address any reliable evidence of eligibility put forward by the claimant."  Love v. National City Corp. Welfare Benefits Plan, 574 F.3d 392, 396 (7th Cir. 2009); 29 U.S.C. § 1133; 29 C.F.R. § 2560.503-1(g).  This "allow[s] the claimant to address the determinative issues on appeal and to ensure meaningful review of the denial."  Id.

The extent of Concert's explanation is set forth in the appeal committee letter, reproduced *supra*.  This letter is little more than a

recitation of some policy provisions.  The letter does not address the central inquiry:  whether the treatment provided by St. Francis was "reasonably available" by Methodist in light of all the facts.  The letter does not even cite the "reasonably available" section of the policy, much less apply it to Mr. Miller's situation.  In fact, the letter could be read to suggest that in-network services were *not* reasonably available by its statement "we do understand that circumstances do arise which prevent using and or seeking in-network providers, but we must apply the benefits according to the policy."  This sentence arguably implies that the Medical Appeal Committee believed that out-of-network rates applied regardless of the availability of in-network services, which directly contradicts the plan language.

Further, there is no indication whether the Millers and St. Francis were given an opportunity to submit any information or notified of their right to do so.  The initial denial appeared to come as an explanation of benefits, which states only that providers have 90 days until the determination becomes final.  The Court sees no indication that Concert gave an opportunity for a "full and fair review" of the claim.   "'Bare conclusions are not a rationale.'" Love, 574 F.3d at 397 (quoted cite omitted).  Even the

arbitrary and capricious standard requires the exercise of discretion, which means a meaningful consideration of the relevant facts and applicable policy provisions.[4]

Mr. Antony did testify in his deposition that he called someone at Methodist who reported that Methodist could treat Mr. Miller, but the appeal committee letter does not mention this, and, in any event, Mr. Antony's testimony is too vague to allow an inference that Concert made any meaningful inquiry into whether the specific treatment received by Mr. Miller at St. Francis was reasonably available at Methodist. Some of the relevant inquiries would necessarily include: 1) whether Mr. Miller needed to be transferred from Holy Family to a Trauma I emergency hospital; whether Methodist is a Trauma I; whether part or all of the treatment provided Mr. Miller at St. Francis was reasonably available at Methodist, and, if so, which part(s); and, how Mr. Miller's condition from August 12-27th factors into the decision regarding whether transfer to Methodist would have been medically contraindicated during his stay at St. Francis.

---

[4] Further, the parties do not identify what comprises the administrative record, making it impossible to review the administrative record under any standard.

As to the parties' discussion of other in-network hospitals in the Chicago area, the Court does not see the relevance. It does not appear that possibility was even considered by Concert until Mr. Antony's deposition. Concert's focus at the relevant time—when Mr. Miller needed treatment— was on Methodist Hospital's status as in-network and Methodist's ability to provide the services. Concert did not suggest at that time that there were any "reasonably available" in-network hospitals located outside of the Peoria area.

"When a plan administrator fails to provide adequate reasoning for its determination, our typical remedy is to remand to the plan administrator for further findings or explanations." Majeski v. Metropolitan Life Ins. Co., 590 F.3d 478, 484 (7th Cir. 2009); Schneider v. Sentry Grp. Long Term Disability Plan, 422 F.3d 621, 629 (7th Cir.2005)("In fashioning relief for a plaintiff who has sued to enforce her rights under ERISA, . . ., we have focused 'on what is required in each case to fully remedy the defective procedures given the status quo prior to the denial or termination' of benefits.")(quoted cite omitted). This is so unless the determination is "so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground." Quinn v. Blue Cross & Blue Shield Ass'n, 161 F.3d 472, 477 (7th Cir. 1998), *abrogated on other*

*grounds by* <u>Hardt v. Reliance Standard Life Ins. Co.</u>, 130 S.Ct. 2149 (2010).

It is not clear at all on this record whether the services provided to Mr. Miller by St. Francis were reasonably available at Methodist. Even if the Court had considered the stricken affidavits offered by the parties, those averments are too conclusory, raising more questions than they answer. For example, why was Mr. Miller transferred from Holy Family to St. Francis, rather than to Methodist?  And, if Dr. Klopfenstein had privileges at Methodist, could he have performed the surgery at Methodist?  Why or why not?  In short, St. Francis has not sustained its burden of showing that the right to benefits is "so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground."  <u>Quinn</u>, 161 F.3d at 477.

Accordingly, St. Francis' Motion for Summary Judgment will be allowed and this case will be remanded to Concert for proceedings in accordance with this opinion.   Specifically, Concert "should conduct a more thorough inquiry" into whether the services provided by St. Francis to Mr. Miller were "reasonably available" at Methodist in light of all the facts and circumstances.  <u>See</u> <u>Love</u>, 574 F.3d at 398.  If Concert concludes that they were, Concert must adequately explain its decision, setting forth the

facts upon which it relies and the applicable policy provisions, and addressing the arguments and evidence presented by St. Francis.

IT IS THEREFORE ORDERED THAT:

1) Concert's motion to strike Dr. Klopfenstein's affidavit and the "Steve Todd Analysis" is granted (d/e 66).

2) Plaintiff's motion to strike Johny Antony's affidavit is granted (d/e 83).

3) Concert's motion for leave to file the affidavit of Deborah Simon is denied (d/e 74).

4) Concert's motion to strike the affidavit of Jennifer Ulrich is granted (d/e 90).

5) St. Francis' motion to take depositions is denied (d/e 95).

6) Concert's motion to strike St. Francis' new argument in its reply brief is denied as moot (d/e 104).

7) Concert's motion for summary judgment is denied (d/e 57).

8) St. Francis' motion for summary judgment is allowed (d/e 85), in that Concert's decision to deny payment of benefits at in-network rates is reversed based upon this record, and this case is remanded to Concert for further proceedings consistent with this opinion.

9) All pending motions are denied as moot. THIS CASE IS CLOSED.

ENTER: October 4, 2011

_____s/ Byron G. Cudmore_____
BYRON G. CUDMORE
UNITED STATE MAGISTRATE JUDGE